## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

(1) SHANE NORRID, individually and )
on behalf of all others similarly situated, )
(2) KERMIT MICHAEL TROXEL, )
individually and on behalf of all others )
similarly situated, )
(3) KEVIN HARTMAN, individually )
and on behalf of all others similarly )
situated, )
(4) TIM HYERS, individually and on )
behalf of all others similarly situated, )
(5) CHRISTOPHER LYNN WILLIAMS,)
individually and on behalf of all others )
similarly situated, )
(6) CODIE SHREVE, individually and )
on behalf of all others similarly situated, )
(7) STEVEN ENGLAND, individually )
and on behalf of all others similarly )
situated )
                     )

      Plaintiffs, )
                     )

      v. )     Case No.   17-cv-401-RAW
                     )

(1) D.A.R.P., INC., an Oklahoma not for )   Jury Trial Demanded
profit corporation, )
(2) RAYMOND JONES, )
(3) HENDREN PLASTICS, INC., an )
Arkansas for profit corporation, )
(4) R & R ENGINEERING CO., INC., )
an Oklahoma for profit corporation, )
(5) GLENN E. WHITMAN, )
(6) SIMMONS FOODS, INC., an )
Arkansas for profit corporation, and )
(7) WESTERN ALLIANCE., INC. )
(formerly JER-CO INDUSTRIES, INC.),)
an Oklahoma for profit corporation )
                     )

      Defendants. )

1

## CLASS ACTION COMPLAINT

Plaintiffs Shane Norrid, Kermit Michael Troxel, Kevin Hartman, Tim Hyers, Christopher Lynn Williams, Codie Shreve, and Steven England ("Plaintiffs"), bring this action on behalf of themselves, and all others similarly situated, and those individuals they seek to represent ("Putative Class Members"), by and through their undersigned counsel of record, and for their Complaint against the above-named Defendants, state as follows:

## INTRODUCTION

1. This is an action brought by survivors of human trafficking and forced labor. Plaintiffs, who were placed in Defendant D.A.R.P.'s work facilities through Oklahoma courts, were made to perform thousands of hours of uncompensated labor for the for-profit businesses and individuals, including, but not limited to, the Defendants named above.

2. This forced labor scheme was developed by Defendant Raymond Jones in conjunction with others in the poultry processing industry, who together created a pipeline for forced labor performed under threats of imprisonment and judicial punishment. To accomplish this, Jones and poultry company Peterson Farms, now owned by Defendant Simmons Foods, Inc., created D.A.R.P., a purportedly "not for profit" organization which operates labor camps to house workers under the guise of rehabilitation and recovery services.

3.  Oklahoma district courts have thus sentenced or sanctioned numerous offenders to attend and complete D.A.R.P.'s "program" as an alternative to incarceration. While represented as a treatment, rehabilitation, or recovery center, D.A.R.P., in reality, consists primarily of long hours of uncompensated contract labor alternated with isolated and squalid living conditions.

4.  Plaintiffs and putative class members found themselves at D.A.R.P., Inc. as a court sentence for criminal charges or a plea deal, in order to comply with drug court requirements, or by voluntarily requesting in-patient drug treatment during the course of probation. Some of the Plaintiffs in this action desperately needed drug and/or alcohol treatment and were sent to D.A.R.P. because they lacked health insurance or the financial resources to pay for in-patient drug treatment.[1] Others did not need drug treatment at all, and instead were sent to D.A.R.P. by a court as an alternative sentencing mechanism as punishment for non-drug related activity.

5.  D.A.R.P. houses up to 80 male workers at a time, including Plaintiffs, at facilities in Tahlequah, Oklahoma and Decatur, Arkansas.[2] These workers are then contracted out for labor. Defendant Pastor Glenn E. Whitman, known as "Pastor Glenn" is a D.A.R.P., Inc. employee or contractor who facilitates these contracts

---

[1] In an article in The Oklahoman, Muskogee County District Judge Mike Norman stated he offered D.A.R.P. and similar programs specifically to individuals in need of drug treatment who had no means to pay for it. "If you don't have insurance, nobody wants you," [Judge] Norman said. "DARP usually doesn't have a waiting list." Brianna Bailey, *Some Oklahoma Courts Prescribe Work at a Poultry Plant as Alternative to Incarceration*, The Oklahoman, October 1, 2017.

[2] D.A.R.P. also owns and operates a third labor camp, for female workers, near Tahlequah, Oklahoma.

in both Oklahoma and Arkansas, providing forced labor to Defendants R&R Engineering Co., Inc., Hendren Plastics, Inc., Simmons Foods, Inc., and Western Alliance, Inc. (formerly Jer-Co Industries, Inc.), among others. Plaintiffs and putative class members work shift work, which means that D.A.R.P., Inc. clients are staffing these companies' plants twenty-four hours a day for no pay.

6. In order to stay at D.A.R.P., Inc., and in many cases, with the threat of prison time hanging over them if they do not complete the D.A.R.P. program, Plaintiffs and putative class members are required to provide this unpaid labor of at least 40 hours per week for one of the for profit companies with which D.A.R.P., Inc. has an established contractual relationship, or by providing unpaid labor to D.A.R.P., Inc. at either facility.

7. Plaintiffs were not paid for any of the hours they worked, including the often significant overtime hours worked. Through information and belief, for profit corporations, including Defendant corporations, directly paid D.A.R.P., Inc., Raymond Jones, or one of their contractors, such as Pastor Glenn, for the forced labor of Plaintiffs and putative class members.

8. Instead of the wages they earn, D.A.R.P. graduates may be offered a $500.00 "gratuity check" upon completion of a six month D.A.R.P. program, or a $1000.00 "gratuity check" for one year. However, receiving a gratuity check is at Defendant Jones' sole discretion.

*4*

9. At both the Tahlequah and Decatur facilities, Plaintiffs and putative class members lived in a metal building in cramped quarters. Both facilities experience a never-ending infestation of bed bugs, such that Plaintiffs experienced bleeding sores and wounds from living with the bed bugs.

10. Plaintiffs received little to no drug treatment or recovery services from D.A.R.P. Instead, Plaintiffs and putative class members were victims of a modern day forced labor scheme, which existed virtually unnoticed for over a decade due to a combination of willful ignorance and enforced silence, and was sanctioned by both courts and members of the faith community.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as claims are brought under 18 U.S.C. § 1595(a) (civil action for trafficking in persons), and 29 U.S.C. § 201 (Fair Labor Standards Act).

12. This court also has jurisdiction over this action pursuant to 28 U.S.C. §1332 (diversity jurisdiction), as it includes citizens of both Oklahoma and Arkansas, and the sum of damages in controversy exceeds $75,000.00.

13. This Court has supplemental jurisdiction over the claims based on state law pursuant to 28 U.S.C. § 1367(a), as the state law claims arise out of the same nucleus of facts which support the federal claims.

14. Venue in the Eastern District of Oklahoma is proper under 28 U.S.C. § 1391 in that various Defendants and/or agents of Defendants reside and/or may be found in this District, and a substantial portion of the communications, transactions, events or omissions underlying Plaintiffs' claims occurred in this District.

## PARTIES

### Plaintiffs

15. Plaintiff Shane Norrid ("Norrid") is a natural person residing in Muskogee County, Oklahoma.

16. In 2016, Norrid was sentenced to complete the D.A.R.P., Inc. program in Decatur, Arkansas by a Wagoner County, Oklahoma judge. Norrid completed the six-month D.A.R.P. program, from March 2016 through September 2016.

17. During his time at D.A.R.P., Norrid was forced to work full time, plus overtime, for free, for Defendant Hendren Plastics, Inc., at Hendren's manufacturing facility in Gravette, Arkansas. D.A.R.P. transported Norrid and other participants directly to and from Hendren Plastics each work day, five to six days per week.

18. Norrid's "employment" at Hendren Plastics was via a contract between Hendren Plastics and Defendant D.A.R.P., Inc., from which Defendants D.A.R.P. or Raymond Jones received compensation for the work performed by Norrid and other D.A.R.P. participants. Norrid and other D.A.R.P. participants at Hendren Plastics never received a paycheck.

19. Norrid worked for Hendren Plastics for a few months until he experienced a hernia. At that time, Norrid received medical treatment from Indian Health Services because he is Native American. Norrid feared he would have been discharged from the program if he had not been able to obtain free medical care and continue working.

20. At D.A.R.P, Norrid was required to live in tight living quarters with horrible bed bugs. He and other participants were allowed only minimal communication with the outside world. Personal phones were strictly prohibited.

21. Norrid was given bologna sandwiches and an expired Little Debbie snack cake for lunch each day.

22. The only purported substance abuse "treatment" Norrid received consisted of in-house Alcoholics Anonymous/Narcotics Anonymous meetings lead by other D.A.R.P. participants.

23. Norrid and the other men were also made to attend Defendant Pastor Glenn's Christian church in Gravette, Arkansas each Sunday.

24. Controlled substances, including methamphetamine, were widely available within the D.A.R.P. facility. The only time Norrid heard from anyone with any real "clean time" during his six month program was on one occasion when a sober biker group came to speak to the men.

25. At the end of the six month program, Norrid was given a $500.00 "gratuity check" by Defendant D.A.R.P. upon his release.

26. Plaintiff Kermit Michael Troxel ("Troxel") is a natural person residing in Wagoner County, Oklahoma.

27. Troxel was sentenced to complete D.A.R.P. by a Wagoner County, Oklahoma judge after his probation was revoked for failure to appear for a court date. Troxel had failed to appear because he could not afford to pay his fines and fees.

28. Troxel was sentenced to complete one year at D.A.R.P., and spent from September 2014 to September 2015 at D.A.R.P. facilities. Troxel first went to the D.A.R.P. facility in Decatur, Arkansas, but after six weeks, Defendant Jones offered Troxel a purported "one year welding internship" at Defendant R&R Engineering Co., Inc. in Broken Arrow, Oklahoma. Troxel was then moved to the D.A.R.P. facility in Tahlequah, Oklahoma.

29. Troxel worked an average of 63 hours per week, for free, as a welding hand for Defendant R&R, per an agreement between Defendants R&R and D.A.R.P. in which Defendants D.A.R.P. or Jones were paid for Troxel's labor, and that of other participants.

30. Troxel never received a paycheck, and was unable to report his employment to the IRS, or, if necessary, seek worker's compensation or unemployment benefits.

31. While working at R&R, Troxel was struck in the eye by a piece of steel. He did not seek medical treatment for fear of being discharged from the program. Troxel observed other participants being kicked out of the D.A.R.P. program, and thus effectively failing the program, as a result of workplace injuries.

32. Troxel was made to live in cramped living conditions, with three roommates, in such close quarters that two men could not comfortably stand in between the bunks at the same time. Troxel reported a never-ending bed bug infestation, which Defendants D.A.R.P. and Raymond Jones "treated" by making D.A.R.P. participants spray pesticides in each room, cover the door with a blanket, and then heat up the room with a kerosene heater. The heater was so hot that it melted the window blinds in his bunk, as well as a picture of his daughter that was affixed to the wall. The bed bug infestation, however, remained.

33. Troxel went without hot water for two weeks while at the Tahlequah facility.

34. The food allowed Troxel and other participants was both inadequate and often spoiled or expired. Troxel was given one bologna sandwich and an expired Little Debbie snack cake for lunch each day. For dinner, Troxel was fed spoiled or otherwise unsaleable chicken from D.A.R.P.'s poultry processing plant five nights per week.

35. Like Norrid, Troxel received little to no drug treatment at the Tahlequah facility. Troxel's sole "treatment" was forced attendance at an Alcoholics Anonymous meeting in Hulbert, Oklahoma every Tuesday night.

36. Troxel and the other men were required to attend a Christian church in Park Hill, Oklahoma each Sunday.

37. Troxel was required to complete community service as part of his sentence. Troxel, however, never completed any real community service. Instead, Troxel performed unpaid labor for Defendant Jones, including mowing, painting, and washing Defendant Jones' two Corvettes, which Defendant Jones has registered as "DARP-1" and "DARP-2."

38. Troxel stated Defendant Jones represented to Troxel's sentencing court that Troxel completed 250 hours of community service during the program. However, this "community service" consisted entirely of unpaid labor for Defendant Jones rather than legitimate volunteer services for any community institutions.

39. Plaintiff Kevin Hartman ("Hartman") is a natural person residing in Stephens County, Oklahoma.

40. Hartman was sent to D.A.R.P., Inc., in Tahlequah, Oklahoma, while on probation in Stephens County, Oklahoma in 2015. Struggling with acute addiction, Hartman had voluntarily requested to go to drug treatment. It was recommended he go to D.A.R.P. by his Stephens County probation officer.

41. Hartman was born with a club foot, a painful condition which led to a pain pill addiction as an adult. Rather than receiving the drug treatment he needed while at D.A.R.P, Hartman was forced to stand for long hours six days per week, for free, while made to work at Jer-Co Industries, Inc. (now Western Alliance, Inc.) in Locust Grove, Oklahoma, per an agreement between Jer-Co Industries and D.A.R.P., Inc. in which Defendants D.A.R.P. or Jones were paid for Hartman's labor, and that of other participants.

42. Hartman experienced withdrawals while working in dangerous conditions.

43. At D.A.R.P., Hartman lived in cramped quarters and with a serious bed bug infestation. Hartman was fed spoiled or otherwise unsaleable chicken from D.A.R.P.'s poultry processing facility five nights per week.

44. Hartman received little to no drug treatment while at D.A.R.P. and experienced a lack of appropriate medical care. Hartman observed that Native American D.A.R.P. participants at the Tahlequah facility received medical care, because Native Americans obtain free health care through Indian Health Services and individual tribes, but other participants such as himself, for whom payment would have been required, did not.

45. Hartman and the other men were required to attend a Christian church in Park Hill, Oklahoma each Sunday.

46. Because of the forced work requirement, extreme physical labor, and a lack of actual drug treatment, Hartman was unable to complete the program. Hartman left D.A.R.P. and his probation was revoked when he got behind on his court fines and fees. As a result, Hartman went to prison. Hartman has anxiety and nightmares as a result of the time he spent at D.A.R.P.

47. Plaintiff Tim Hyers ("Hyers") is a natural person residing in Stephens County, Oklahoma.

48. Hyers was sent to D.A.R.P., Inc. when he requested in-patient drug treatment from his probation officer in Stephens County, Oklahoma. Hyers went to D.A.R.P. in Tahlequah, Oklahoma because it was the only choice he had for the treatment he desperately sought.

49. Hyers completed a six-month program from March 2015 through September 2015.

50. Hyers received little to no drug treatment while at D.A.R.P., aside from watching a few Christian movies with the group. Drugs, including methamphetamine, were widely available at D.A.R.P.

51. Hyers worked for D.A.R.P., Inc. in D.A.R.P.'s on-site poultry processing facility and as a cook. Though Hyers arrived to D.A.R.P. experiencing full-blown drug withdrawals, he was forced to report to work within hours of his arrival. Hyers became extremely dehydrated and received no medical care.

52. Hyers' job consisted primarily of picking up dead chickens and putting them in maggot-filled barrels on a daily basis; killing chickens for approximately 4.5 hours per day; then doing laundry, cleaning the kitchen, and cooking dinner for 35 men. Hyers was never paid for his employment with D.A.R.P., nor could he file taxes with the IRS, receive worker's compensation, or file for unemployment compensation.

53. Hyers and the other men were also made to attend a Christian church in Park Hill, Oklahoma each Sunday.

54. While at D.A.R.P., Hyers got behind on child support payments because he was not paid. Hyers experienced trauma and the loss of one year of his life while at D.A.R.P., all while being frequently threatened with prison by Defendant Jones if he failed to complete the program.

55. Additionally, Defendant Raymond Jones refused Hyers' requests for home visits, stating Hyers lived too far away for Defendant Jones to make random visits and searches of Hyers' mother's home. Not only was Hyers deprived of the drug treatment he sought, he was denied family support.

56. Plaintiff Christopher Lynn Williams ("Williams") is a natural person residing in Cleveland County, Oklahoma.

57. Williams was sent to D.A.R.P., Inc. in Decatur, Arkansas for drug court compliance by a Cleveland County judge. Williams completed three months of a six month program, from approximately July 2017 to October 2017.

58. Williams told his Cleveland County judge D.A.R.P. was "decent" during his monthly check-ins with the Court, because a D.A.R.P., Inc. employee, Rex Rector, drove Williams from Decatur, Arkansas to Norman, Oklahoma for court each month and sat in the courtroom listening to what Williams reported to the judge.[3] While Williams did not want to lie to the judge, he also feared retaliation from D.A.R.P. (ie., prison), if he failed the D.A.R.P. program.

59. Williams received little to no drug treatment while at D.A.R.P. and lived in cramped living conditions with an infinite bed bug infestation.

60. Williams and the other men were made to attend Defendant Pastor Glenn's Christian church in Gravette, Arkansas each Sunday. Williams was also made to attend a church service lead by Pastor Glenn at the D.A.R.P. facility on Wednesdays.

61. Williams was made to work for Defendant Hendren Plastics, Inc. while at D.A.R.P. and received no compensation for his employment, per an agreement between Defendants Hendren and D.A.R.P. in which Defendants D.A.R.P. or Jones were paid for Williams' labor, and that of other participants.

---

[3] Since Drug Court proceedings are closed, it is unknown to Plaintiffs why Rector was allowed to monitor D.A.R.P. participants' statements to the Cleveland County Court.

62. Williams never missed a day of work. He observed Defendant D.A.R.P. adding time to other participants' programs if they were sick.

63. Williams could not file taxes on his employment, receive worker's compensation, or file unemployment, if needed.

64. Williams petitioned the court to leave D.A.R.P. early when a family member shared an article from The Oklahoman about D.A.R.P. and similar programs published on October 1, 2017. Williams believed the article validated his own experience and his serious concerns about the D.A.R.P. program. Cleveland County District Court Judge Tupper granted Williams' petition to leave D.A.R.P. early and continue participating in the Drug Court program in Cleveland County, Oklahoma.

65. When Defendant D.A.R.P. learned that later two other participants had petitioned the Cleveland County Court to leave the program early, D.A.R.P. retaliated by preemptively discharging them from the program.

66. Plaintiff Codie Shreve ("Shreve") is a natural person residing in Muskogee County, Oklahoma.

67. Shreve was sent to D.A.R.P., Inc., in Decatur, Arkansas, by a Wagoner County, Oklahoma judge. Shreve was on probation for a non-drug offense and was sent to D.A.R.P. due to a probation violation of testing positive for marijuana.

68. Through information and belief, Shreve believes that a former Director at D.A.R.P., Inc. requested the judge send him to D.A.R.P.  Shreve completed an 18-month D.A.R.P. program and lived at the facility in Decatur for approximately 22 months. While at D.A.R.P., Shreve first worked for Peterson Farms, followed by Defendant Simmons Foods, Inc. ("Simmons"), which bought out Peterson Farms, per an agreement between Defendants Simmons and D.A.R.P. in which Defendants D.A.R.P. or Jones were paid for Shreve's labor, and that of other participants.

69. At Peterson and Defendant Simmons, Shreve worked third shift on the evisceration line as a drawer. From 9:00 pm to 9:00 am each day, Shreve was forced to insert his hands into chickens and remove their organs for U.S.D.A. inspection, for no pay. The line handled approximately 90 chickens per minute. Shreve never received a paycheck from Defendants.

70. Evisceration work was extremely hard on Shreve's hands. While it is industry practice for the two positions on the evisceration line, drawers and trimmers, to switch places every 2.5 hours, Shreve was never allowed to switch places with the trimmer.

71. Shreve complained to Defendant D.A.R.P. about the hand pain he experienced from his forced labor, and Defendant Jones told him if he could not do his job, he would be discharged from and fail the program, facing prison time.

72. Unable to receive medical care, accommodation, or quit due to threat of imprisonment, Shreve soaked his hands in hot wax every day to reduce the swelling, and ten years later, his hands go numb if he doesn't frequently move them.

73. While working for Simmons following Simmons' buy-out of the Peterson Farms facility, Shreve got a staph infection on the back of his leg. Shreve worked in hot, wet conditions, so the infection grew worse. When Shreve went to the free clinic offered to Simmons employees, he was charged $150.00 by D.A.R.P. for seeking medical attention (taken from his "gratuity check").

74. Shreve was given antibiotics, and forced to return to the same hot, wet working conditions. When the antibiotics failed to work, Shreve showed his father the infection during a weekend visit. Shreve's father took him to the emergency room, where the E.R. doctor lanced, cleaned, and packed the infection, gave Shreve stronger antibiotics, and told him not to return to the same working conditions until his leg healed.

75. Shreve requested a note from the doctor, and when he gave the note to D.A.R.P., Defendant Jones told him not to seek outside medical treatment while at D.A.R.P. and told him he could either return to work or fail the program (and thus face imprisonment). Shreve returned to work at Simmons and was fortunately able to

obtain a temporary work assignment from Simmons managment away from the eviseration line.

76. At D.A.R.P., Shreve lived in extremely cramped quarters with sixty other men who worked primarily at the chicken processing plant. Shreve observed that their living quarters were never clean, even though each person had daily chores, because someone was working every shift of the day (ie., D.A.R.P. staffed Defendant Simmons 24 hours per day).

77. Shreve and the other men were also made to attend Defendant Pastor Glenn's Christian church in Gravette, Arkansas each Sunday. Shreve was also made to attend a church service lead by Pastor Glenn at the D.A.R.P. facility on Wednesdays.

78. The only "treatment" at D.A.R.P. was an in-house group AA/NA meeting three nights per week, where the men would get together and read from a 12-step book.

79. Shreve was made to provide unpaid labor to Pastor Glenn during his stay at D.A.R.P., including cleaning Pastor Glenn's personal chicken houses.

80. Plaintiff Steven England ("England) is a natural person residing in Comanche County, Oklahoma.

81. England was sent to D.A.R.P., Inc. by a Comanche County judge as part of his sentence. England was sent to the D.A.R.P. facility in Tahlequah, Oklahoma and completed an eight month program beginning in August 2014.

82. While at D.A.R.P., England worked an average of 63 hours per week, for free, for Defendant R&R Engineering, per an agreement between Defendants R&R and D.A.R.P. in which Defendants D.A.R.P. or Jones were paid for England's labor, and that of other participants.

83. Upon completion of the D.A.R.P. program, England tried to file taxes based on the hundreds of hours of labor he provided to R&R. England was told that there was no record of him ever being employed by R&R.

84. England attended a mandatory AA meeting once a week in a small town outside of the D.A.R.P. facility. England received no other drug treatment or rehabilitation.

85. England was fed spoiled or unsaleable chicken from D.A.R.P.'s poultry processing facility five nights per week. The chicken was fed to the men because it would not pass inspection for sale. England sometimes used small amounts of his own money to buy pork chops or other meat he found on sale on his one day off per week. England would then cook dinner for himself and the other D.A.R.P. participants.

86. England and the other men were also made to attend a Christian church in Park Hill, Oklahoma each Sunday.

87. England lived in tight living quarters and experienced a bed bug infestation.

88. While at D.A.R.P., England experienced significant dental pain and was sent to a dentist by D.A.R.P. for extractions.

89. At the end of his program, England received a $700.00 "gratuity check" from D.A.R.P.   D.A.R.P. kept a portion of England's gratuity due to the teeth extractions he received during the program.

### Defendants.

89. Defendant, D.A.R.P., Inc. ("D.A.R.P."), is a not for profit corporation, organized under the laws of Oklahoma.

90. Defendant, Raymond Jones ("Jones"), is a natural person residing in Cherokee, Oklahoma. Jones is the President, Registered Agent, and Incorporator of D.A.R.P., Inc.

91. Prior to incorporating D.A.R.P., Jones had no known training or experience in the creation or operation of a substance abuse treatment program or providing recovery, rehabilitative or correctional services.

92. Instead, Jones had earned a living through a wide variety of legal and illegal means, ranging from accepting contributions as a purported traveling preacher to poultry production and manufacturing of methamphetamine.

93. Defendant, Glenn E. Whitman ("Whitman"), is a natural person residing in Benton County, Arkansas. Whitman is an employee, agent, or contractor of D.A.R.P., Inc..

94. Defendant Glenn Whitman also represents himself as a Christian pastor who provides religious worship and instruction to D.A.R.P. workers.

95. Whitman helped facilitate D.A.R.P.'s labor agreements with for profit businesses, including but not necessarily limited to, Defendants Simmons Foods, Hendren Plastics, R&R Engineering and Jer-Co Industries, Inc. (now Western Alliance, Inc.).

96. Defendant Whitman also knowingly personally profited from unpaid labor provided by Plaintiffs and putative class members at his home and chicken houses.

97. Defendant Hendren Plastics, Inc., is a not for profit corporation, organized under the laws of the state Arkansas, and is headquartered in Sulphur Springs, Arkansas.

98. Defendant R&R Engineering Co., Inc., is a for profit corporation organized under the laws of the state of Oklahoma.

99. Defendant Simmons Foods, Inc., is a for profit corporation organized under the laws of the state of Arkansas, and is headquartered in Siloam Springs, Arkansas.

100. Defendant Western Alliance, Inc., is a for profit corporation organized under the laws of the state of Oklahoma, and is headquartered in Locust Grove, Oklahoma. Defendant Western Alliance, Inc., was previously incorporated as Jer-Co Industries, Inc., and was incorporated as Western Alliance, Inc. on May 13, 2016.

## CLASS ACTION ALLEGATIONS

101. Plaintiffs bring claims for actual damages on behalf of themselves and all similarly situated persons pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

102.   At all times relevant to this action, Plaintiffs and putative class members were obligated to live at D.A.R.P. facilities and perform unpaid labor for Defendants or face jail or prison time.

103.   The class is defined as all male participants of D.A.R.P. programs from October 2007 through the filing date of this Complaint.

### A.   Rule 23(a).

104.   The precise number of individuals in the class is known only to Defendants, but the Class is believed to include up to 2000 individuals.  Because of the number of putative class members, joinder of all putative class members is impracticable.

105.   This action involves questions of law common to the class, including:

   a. Whether Defendants' conduct violated the forced labor and trafficking provisions of the TVPRA (18 U.S.C. §§ 1589, 1590, 1593A, and 1594);

   b. The terms of Plaintiffs' and other putative class members' employment with Defendants;

   c. The nature of damages available to Plaintiffs and other putative class members, including the applicability of compensatory and/or punitive damages.

106.   This action involves questions of fact common to the Class, including:

a. Whether Defendants used and/or threatened Plaintiffs and other putative class members with abuse of the legal process in order to obtain Plaintiffs' and other putative class members' labor or services;

b. Whether Defendants recruited, harbored, transported, obtained and/or provided Plaintiffs and other putative class members for the purpose of subjecting them to forced labor and/or involuntary servitude;

c. Whether Defendants knowingly benefitted from participating in a venture that Defendants knew or should have known was engaged in providing and/or obtaining Plaintiffs' and other putative class members' labor or services through abuse of the legal process;

d. Whether Defendants knowingly benefitted from participating in a venture that Defendants knew or should have known was engaged in the recruitment, harboring, transporting, obtaining and/or providing Plaintiffs and other putative class members for the purpose of subjecting them to forced labor and/or involuntary servitude;

e. Whether Defendants used standardized recruitment, record-keeping, and employment policies and practices for Plaintiffs and putative class members;

      f.   Whether Defendants made false reports to courts of law; and

      g.   The source and amount of Plaintiffs' and other class members' damages.

107.   The claims asserted by Plaintiffs are typical of the claims of the Class.

108.   Plaintiffs will fairly and adequately protect the interests of the Class.

109.   Plaintiffs' counsel are experienced handling significant federal litigation and are prepared to advance costs necessary to vigorously litigate this action.

     **B.**    **Rule 23(b)(3).**

110.   Common questions of law and fact relevant to the claims for relief, as identified above, predominate over any pertinent questions involving only individual members.

111.   A class action is superior to other available methods of adjudicating the claims set forth in the claims for relief because, *inter alia*:

      a.   Common issues of law and fact, as identified in part above, substantially diminish the interest of putative class members in individually controlling the prosecution of separate actions;

      b.   The putative class members are individuals who lack the means and/or resources to secure individual legal assistance and/or who are particularly likely to be unaware of their rights to prosecute these claims;

   c.  No member of the class has already commenced litigation to determine the questions presented; and

   d.  A class action can be managed with efficiency and without undue difficulty because Defendants have systematically and regularly committed the violations complained of herein and have used standardized recruitment, record-keeping, and employment policies and practices.

## D. CAUSES OF ACTION

**COUNT I: INVOLUNTARY SERVITUDE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1595.**

112.   Plaintiffs and putative class members re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

113.   Plaintiffs bring this claim on behalf of themselves and all other similarly situated individuals against all Defendants.

114.   Plaintiffs are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003 (TVPRA), 18 U.S.C. § 1595.

115.   Plaintiffs are victims of forced labor, involuntary servitude and human trafficking in violations of Title 18 U.S.C. §§ 1589, 1590, 1593A, and 1594.

116.   Defendants attempted to and did subject Plaintiffs and putative class members
to forced, unpaid labor in violation of 18 U.S.C. § 1589.

117.   Defendants knowingly obtained the forced labor and services of Plaintiffs and
putative class members through serious harm and threats of serious harm,
including serious financial and physical harm, in violation of 18 U.S.C. §
1589(a)(2).  Defendants forced Plaintiffs and putative class members to work long
hours in often extreme conditions for free, under the threat of incarceration if
Plaintiffs and putative class members refused. Defendants intentionally kept
Plaintiffs and putative class members in a condition of financial and legal
vulnerability so that they had no choice but to labor for Defendants.

118.   Defendants knowingly obtained the labor and services of Plaintiffs and
putative class members by means of a scheme, plan, or pattern which, in the
totality of the circumstances, was intended to coerce, and did coerce, Plaintiffs and
other putative class members to believe that they would suffer serious harm,
including prison time, if they were to leave the employ of Defendants, in violation
of 18 U.S.C.§ 1589(a)(4).

119.   Defendants' scheme included fraudulent recruitment practices and false
reporting to courts to induce Plaintiffs and putative class members to enter an
inpatient drug treatment program, which included working to pay for the cost of
the program. Plaintiffs and putative class members, however, found themselves at

a work camp where little to no drug treatment was provided, instead working for Defendants under unlawful conditions.

120.   Defendants knowingly recruited, harbored, transported, and/or obtained Plaintiffs and the putative class members for labor or services in violation of laws prohibiting involuntary servitude and/or forced labor, in violation of 18 U.S.C. § 1590.

121.   Alternatively, Defendants have knowingly benefitted financially and/or by receiving the value of unpaid labor from a vulnerable population, many of which were completing the D.A.R.P. program as an alternative to incarceration, and many that had a legitimate need for, and often desperate desire for, drug and/or alcohol treatment. Defendants knew or should have known they were engaged in violations of the TVPRA, or acted in reckless disregard of the fact that the venture was engaged in violations of the TVPRA, in violation of sections 1589, 1593A, and 1595. Defendants intentionally ignored the various complaints made by Plaintiffs and putative class members regarding such fraudulent and coercive conditions.

122.   As a result of their participation in such venture, Defendants were to receive, and did knowingly receive, numerous benefits including:

        a.  having a steady stream of unpaid workers from which to profit;

b.  failing to provide legal employment documentation to employees, including W-4 and W-2 forms for personal income tax; and

c.  having easily exploitable labor available to staff Defendants' businesses.

123.  Defendants conspired to commit the violations of the Trafficking Victims Protection Reauthorization Act described herein, in violation of section 1594. Defendants worked in partnership to implement a scheme of fraudulent recruitment practices, designed to force Plaintiffs and putative class members to work for free in extreme conditions, under the threat of incarceration.

124.  Plaintiffs and other putative class members suffered injury as a proximate result of these actions.

125.  Plaintiffs and other putative class members are entitled to compensatory and punitive damages in an amount to be determined at trial and any other relief deemed appropriate, including reasonable costs and attorneys' fees.

## COUNT II: HUMAN TRAFFICKING FOR LABOR IN VIOLATION OF 21 O.S. § 748 AND 21 O.S. 748.2.

126.  Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

127.  Defendants' scheme forced vulnerable individuals into unpaid labor while living in deplorable conditions.

128.   Defendants' financially benefited from the forced labor of Plaintiffs and putative class members.

129.   Plaintiffs and putative class members experienced significant harm as a result of Defendants' actions.

## COUNT III: FAILURE TO PAY MINIMUM WAGE AND OVERTIME HOURS IN VIOLATION OF FAIR LABOR STANDARDS ACT, 29 U.S.C. § 201, *et. seq.*

130.   Plaintiffs and putative class members re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

131.   Defendants are employers and are engaged in commerce. As such, Defendants are subjected to compliance with the Fair Labor Standards Act, 29 U.S.C. § 201, *et. seq.*

132.   Plaintiffs and putative class members were employed by Defendants. Each Plaintiff and putative class member worked *at least* 40 hours per week for Defendants.

133.   Defendants failed to compensate Plaintiffs and putative class members.

134.   Defendants failed to provide Plaintiffs and putative class members with the minimum wage, in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et. seq.*

135.   Defendants failed to provide Plaintiffs and putative class members with overtime compensation for hours worked beyond 40 hours per week, in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et. seq.*

136.   Defendants failure to provide Plaintiffs and putative class members with the minimum wage and overtime compensation was a knowing and wilful violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et. seq.*

**COUNT IV: FAILURE TO PAY MINIMUM WAGE AND UNPAID WAGES IN VIOLATION OF OKLAHOMA PROTECTION OF LABOR ACT, 40 O.S. § 161, *et. seq.***

137.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

138.   Defendants are employers subject to the Oklahoma Protection of Labor Act, 40 O.S. § 161, *et. seq.*

139.   Defendants failed to compensate Plaintiffs and putative class members.

140.   Defendants failed to provide Plaintiffs and putative class members with all wages, including the minimum wage, in violation of the Oklahoma Protection of Labor Act, 40 O.S. § 161, *et. seq.*

141.   Defendants failure to provide Plaintiffs and putative class members with the minimum wage and overtime compensation was a knowing and wilful violation of the Oklahoma Protection of Labor Act, 40 O.S. § 161, *et. seq.*

**COUNT V: FRAUD**

142.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

143.   Defendants falsely represented to Plaintiffs and putative class members that Plaintiffs and putative class members would receive inpatient drug and alcohol treatment and/or recovery services. Defendants knowingly misled Plaintiffs and putative class members into believing if Plaintiffs and putative class members did not complete the program, they could face substantially penalties and a loss of liberty through incarceration.

144.   Defendants knowingly misrepresented the D.A.R.P. program as a drug treatment program, instead of a work camp.

145.   Plaintiffs and putative class members suffered harm as a result of Defendants' misrepresentations, including lost earning potential, degradation, and a loss of liberty.

146.   Defendants are liable to Plaintiffs and putative class members for the harm caused by their misrepresentations.

**COUNT VI: UNJUST ENRICHMENT**

147.   Plaintiffs and putative class members re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

*31*

148.   Plaintiffs and putative class members rendered thousands of hours of unpaid labor to Defendants over the span of a decade.

149.   Defendants knowingly accepted the benefits of forced labor provided to them by Plaintiffs and putative class members.

150.   Defendants knowingly and unfairly benefited from the forced labor provided to them by Plaintiffs and putative class members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Putative Class Members respectfully request relief and pray for judgment against Defendants in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), to include the following:

a.   Certifying Plaintiffs' Claims for Relief in this action as class claims pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure;

b.   Designating Plaintiffs as class representatives pursuant to Federal Rule of Civil Procedure 23, and designating Counsel for Plaintiffs as Counsel for the Class;

c.   Compensatory damages;

d.   Punitive damages;

e.   Injunctive relief;

f.   Awarding Plaintiffs' reasonable attorneys' fees and costs; and

g.   Such other relief as the Court deems just and appropriate.

Plaintiffs and Putative Class Members reserve the right to amend their demand for judgment as new information is discovered during the course of this case.

Respectfully Submitted,

Brady R. Henderson, OBA#21212
Amy N. Gioletti, OBA#30566
ACLU of Oklahoma Foundation
P.O. Box 1626
Oklahoma City, OK 73101
(405) 525-3831, (405) 524-2296 (fax)
*Attorneys for Plaintiffs, and all others similarly situated*

<u>Verification</u>

I _Shane Norrid_ have read the attached complaint on this

date _10-30-17_ and verify, to the best of my knowledge, the complaint is

true and correct as it applies to me.


_Shane Norrid_
Print Name


_Shane Norrid_
Signature

<u>Verification</u>

I <u>Kermit Michael Troxel</u> have read the attached complaint on this

date <u>10 - 30 - 17</u> and verify, to the best of my knowledge, the complaint is

true and correct as it applies to me.


<u>Kermit Michael Troxel</u>
Print Name

_____
Signature

<u>Verification</u>

I _Kevin Hartman_____ have read the attached complaint on this

date _10-27-17_____ and verify, to the best of my knowledge, the complaint is

true and correct as it applies to me.


_Kevin Hartman_____
Print Name

_Kevin Hartman_____
Signature

<u>Verification</u>

I _Timothy Hyers_____ have read the attached complaint on this

date _10-29-17_____ and verify, to the best of my knowledge, the complaint is

true and correct as it applies to me.


_Timothy Hyers_____
Print Name


_(signature)_____
Signature

<u>Verification</u>

I *Christopher Williams* have read the attached complaint on this

date *10·27· 2017* and verify, to the best of my knowledge, the complaint is

true and correct as it applies to me.


*Christopher Williams*
Print Name


*Chris Wi...*
Signature

<u>Verification</u>

I _Codie Shreve_ have read the attached complaint on this

date _10/30/17_ and verify, to the best of my knowledge, the complaint is

true and correct as it applies to me.

_Codie Shreve_
Print Name


_Codie Shreve_
Signature

## Verification

I _STEVEN ENGLAND_ have read the attached complaint on this

date _OCT 27, 2017_ and verify, to the best of my knowledge, the complaint is

true and correct as it applies to me.


STEVEN ENGLAND
Print Name


Signature